**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>BRADLEY RUSKTALES, )<br>)<br>Defendant. ) | Case No. 1:21-cr-41-5 (CJN) |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.   INTRODUCTION**

It is with a somber heart that Brad Rukstales appears before this Court for sentencing following his acceptance of responsibility upon entering a plea of guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Mr. Rukstales' actions on January 6, 2021, weigh heavily on his mind, and his regret and remorse are not only sincere and genuine, they were also immediate. On January 7, 2021, Mr. Rukstales issued a public apology which states in part, "It was the single worst decision of my life; I have no excuse for my actions and wish that I could take them back." *See* Exhibit L (below). The entirety of Mr. Rukstales' public apology is included here:

1

> **Statement from Brad Rukstales**
>
> In a moment of extremely poor judgment following the Jan. 6 rally in Washington, I followed hundreds of others through an open set of doors to the Capitol building to see what was taking place inside. I was arrested for the first time in my life and charged with unlawful entry.
>
> My decision to enter the Capitol was wrong, and I am deeply regretful to have done so. Without qualification and as a peaceful and law-abiding citizen, I condemn the violence and destruction that took place in Washington.
>
> I offer my sincere apologies for my indiscretion, and I deeply regret that my actions have brought embarrassment to my family, colleagues, friends and fellow countrymen.
>
> It was the single worst personal decision of my life; I have no excuse for my actions and wish that I could take them back.

Bradley Rukstales, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing.

### *Sentencing Request*

Based upon Mr. Rukstales' personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, and the almost nonexistent likelihood of recidivism, Mr. Rukstales respectfully requests that the Court impose a probationary sentence in this matter, as it would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

### *Brad Rukstales' Background*

Brad Rukstales is a fifty-three (53) year old husband and father of two daughters. *See* PSR at ¶ 43. He grew up in a loving and supportive household and describes his childhood as "enjoyable, challenging (in a good way) and preparing." *Id.* At ¶ 41. He played a variety of sports as a teenager and sang in the school choir. *Id.*

Music has become a large part of Mr. Rukstales' life, and it is woven into his family fabric. Mr. Rukstales plays several instruments including piano, has written musicals in which he acted in and performed throughout his community, and he passed that passion onto his children – evident by his daughter Morgan becoming a music teacher. *Id* at ¶ 45; *see also* Exhibit F.

Mr. Rukstales met his wife while in college at Indiana University - Bloomington and has been married for twenty-nine (29) years. *Id*. at ¶ 43. After putting himself through graduate school and obtaining an impressive resume of work experience, Mr. Rukstales started his own company in 2002. *Id* at ¶ 57 – 62. As a direct result of his involvement in the instant offense, Mr. Rukstales was forced to resign and sell his ownership stake in the company he launched and loved. *Id* at ¶ 64.

Brad Rukstales is a man who strives to live his life by the values of honesty, authenticity, humility, accountability, and forgiveness. He is a devout Christian who is active in his church and community on many levels and is involved in charity work both here and abroad. Mr. Rukstales not only believes in the principles of helping those in need – he lives them. He found success in business and is fortunate to be financially blessed, but one would not know it from interacting with him. He does not boast, and gives generously and quietly, encouraging others to do the same and leading by example. *See* Exhibits B-K.

## II.   18 U.S.C. § 3553(A) FACTORS

### A.  The Nature and Circumstances of the Offense.

Mr. Rukstales' involvement in the instant offense is extraordinarily regrettable. As he writes in his letter to the Court, "I am deeply embarrassed and sorry for my actions." *See* Exhibit A. Unlike almost anyone else involved in the January 6 Capitol breach cases, Mr. Rukstales

recognized his culpability and apologized for his conduct immediately – on January 7, 2021. *See* Exhibit L. As echoed in the apology and conversations with his loved ones, Mr. Rukstales is unwavering that he made the biggest mistake of his life on that day. *Id*; *see also* Exhibit I.

In his letter, Mr. Rukstales explains to the Court that he is a flawed man who tries to live every day of his life by the values of "truthfulness and honesty," "authenticity and humility," and "accountability and forgiveness." *See* Exhibit A.  However, on that day, Mr. Rukstales tells the Court that he "violated [his] own values," and makes no excuses, humbly stating, "I accept complete responsibility and am accountable for my actions on January 6, 2021." *Id*.

Mr. Rukstales came to Washington, D.C. that day because he "passionately believes in civic engagement" and was "personally frustrated" with the country's "political discourse." *Id*. He travelled to the District with his wife and daughter to attend a political rally at the Ellipse, not to march on the Capitol or jumpstart a 'revolution.'  Mr. Rukstales eventually joined the crowd. As he followed hundreds of others walking into the Capitol, Mr. Rukstales "hoped there was some reason that [he] would be okay walking into the Capitol," but he "knew that it was not right." *Id*.



[redacted]

Nevertheless, Mr. Rukstales does not shy away from the fact that January 6, 2021 was "a sorry day in my life." *Id*. He further proclaims that "I can say – clearly – that I should not have gone to the Capitol on January 6, and should not have allowed my emotions to get the better of me." *Id*.

### B. Mr. Rukstales' History and Characteristics.

Brad Rukstales is beloved by his family and friends as evidenced by the numerous letters of support submitted on his behalf. *See* Exhibits B-K. The letters submitted on his behalf paint the portrait of a man who is well respected, loved, and admired for his kindness, business acumen, faith, and devotion to his family and community. *Id*.

Jill Rukstales met Mr. Rukstales while they were in college, and they "have been together ever since." *See* Exhibit B. Married for twenty-nine (29) years, Jill provides the Court with a snapshot of the type of man, husband, and father that Brad Rukstales has been and continues to be. *Id*. She is straightforward with the Court and explains that "Brad's actions that day were completely out of character of the man I married," and that they "are mortified over his involvement." *Id*. She knows that her husband has a "strong moral compass," but "clearly violated his own values that day" and "is truly remorseful" for his actions. *Id*. She speaks proudly of how Mr. Rukstales is "not only a wonderful husband, but also an amazing father" as she tells of a recent story where Mr. Rukstales drove "7 hours each way" just to have lunch with his daughter Morgan on her birthday. *Id*. She also provides the Court with great insight into Mr. Rukstales as friend. *Id*. She tells the story of how a friend of Mr. Rukstales was helping his father on a road trip from California to Tennessee when the friend's father fell ill and "needed to be hospitalized." *Id*. The friend called Mr. Rukstales, and he took the next flight to meet his friend and assist him in completing the drive to Tennessee. To put it simply, Mr. Rukstales is "kind and dependable." *Id*. He has also been involved in many charitable organizations and events throughout his life, including "Habitat for Humanity, Special Olympics, Homes for Vets, and other small service projects." *Id*. In addition to their charitable work, she is equally proud of their

6

mission work and explains that "our faith is a pillar in our marriage and our family," and Mr. Rukstales is a "man of faith, with a heart for service." *Id*. She is "certain" that Mr. Rukstales "will never violates his own principles again" and "never make this type of mistake again." *Id*.

Diane Rukstales is Mr. Rukstales' sister, and she tells the Court that "January 6th is extremely out of character and has been a shock to myself, my family and his friends." *See* Exhibit C. She has nothing but positive things to say about her brother, and "cannot recall him ever being in any type of trouble as a youth." *Id*. In fact, she claims that "it would be very difficult to find someone who has anything negative to say about my brother." *Id*. Diane is a psychologist who works with inner city children in Chicago, and Mr. Rukstales is always asking his sister how he can help improve the lives of the children she works with, many of whom come from difficult life circumstances. *Id*. As an example, Mr. Rukstales contributes yearly to a coat drive that Diane works with, and even opened vacant rooms in the office building he owns to those who needed space for homeschooling in the midst of the pandemic. *Id*. She describes Mr. Rukstales as "energetic, curious, and fun loving," and tells the Court stories of how he organizes family vacations, threw his parents an amazing fiftieth wedding anniversary party, and throws lavish Christmas parties for his employees. *Id*. These stories describe who Mr. Rukstales is – a generous and thoughtful family man who cares about his community and the needs of others. His conduct on January 6 was an extreme aberration. *Id*. Diane knows her brother has a "big heart" and that he has been "very humbled and devastated by this experience, and he has expressed great remorse for what he has done." *Id*.

Mr. Rukstales' mother, Adrienne Rukstales, writes a loving and proud letter to the Court, describing her son as 'thoughtful and loving," and "one I could count on for any need." *See* Exhibit D. Her tone is one of deep love, appreciation, and pride for a son who has lived well,

7

cared for others, and been "by her side" through all of life's trials and tribulations. *Id*. She recalls many occasions that are demonstrative of Mr. Rukstales' strong moral character – whether it was accompanying him to South Africa on their mission trip in 2014, or riding in the ambulance with her to the hospital after a minor auto accident. *Id*.

Mr. Rukstales has always had a knack for business as already discussed, but his mother tells an interesting story of how Mr. Rukstales paid it forward during their mission trip. While there, Mr. Rukstales helped a young entrepreneur launch a community laundromat, making several trips spanning months, providing business insight and knowledge, so much so that the young man was able to expand his business. *Id*. This example is just one of many examples of Mr. Rukstales' caring, loving, and generous nature, which expanded with Cogensia Cares, the "charity arm" of Cogensia, Mr. Rukstales' business. *Id*. She feels sadness for her son, and despite his actions, she remains steadfast in her belief that through it all, Mr. Rukstales "has been a wonderful son, loving brother, an honest employer and a force for good in his community." *Id*.

Ava Rukstales is Mr. Rukstales' youngest daughter, and she states that "for as long as I can remember, my father has been a strong, compassionate leader who will go above and beyond for the people he loves." *See* Exhibit E. Whether it was "flowers after a dance recital" or "flying from Chicago to Detroit to see my music debut in college," her father has "worked hard to make sure that the people around him feel respected and thought about." *Id*. She tells a moving story about a young man named Caleb that she dated at one point. *Id*. Caleb lost his father "when he needed him the most," and even though Caleb was no longer dating Ava, Mr. Rukstales "drove nearly 5 hours one way to have coffee with him" simply to "show love and compassion to someone who needed a father's guidance." *Id*. She shares her vulnerability about being "bullied and harassed out of both private and public school" and how her father used to play music for her

8

to build her self-esteem and confidence back – "through sharing his feelings with music, he empowered me, giving me strength through adversity and confidence to endure the pain I was feeling." *Id*. She knows Mr. Rukstales' actions on January 6 are "out of character for the father I know and respect" and is "confident that he will not commit another offense." *Id*.

Mr. Rukstales' eldest daughter, Morgan, has "always known my father to be a generous person and a person who has a deep heart for service and loving others." *See* Exhibit F. She is a music teacher and attributes her love for "musicianship" to her father. Morgan begins her letter by telling the Court how her father "would have me sing and play violin/viola with him as he played piano," and how that "introduced me to the joy of music making at a young age." Mr. Rukstales has "led by example" in teaching his daughters the values of hard work and service to others, including "setting aside time and money for those who could use an extra helping hand." *Id*. She brings up a vital part of Mr. Rukstales' charitable works – that it is "always without patronization or shame meant towards those being helped." *Id*. Instead, they view their blessings and charitable work as part of their Christian duty. *Id*.

Morgan also tells the story mentioned by Jill, about Mr. Rukstales driving 7 hours to surprise her on her birthday, although they "disagree politically, he has shown me that his love is unconditional, and that he is someone that I can always depend upon to be there for me when I need him." *Id*. Morgan is also very blunt with the Court that she does "not condone his actions" but that his actions "should not taint his character." *Id*. "In our many conversations since the day of his charges, I have heard how remorseful he is and how he wishes he never would have been there." *Id*.

Richard Fischman has known Mr. Rukstales for over twenty (20) years in both a professional and personal capacity. *See* Exhibit G. Mr. Fischman was "stunned" when he learned

9

of Mr. Rukstales' arrest and conviction because he "couldn't believe he would participate in such a riotous event." *Id*. He has always known Mr. Rukstales to be a "smart, caring, and considerate person with deep ties to his family and religion." *Id*. Mr. Fischman provides the Court a great example of Mr. Rukstales' thoughtfulness and integrity. While advising Mr. Rukstales on his business ventures, Mr. Rukstales wanted to bring in two individuals as owners, something Mr. Fischman advised against. *Id*. However, Mr. Rukstales was adamant and explained that he made a promise to the other individuals – "I gave them my word and that's what is right" – so that's what Mr. Rukstales did. *Id*. In short, Mr. Rukstales is a man of his word and cares deeply about his values. *Id*. Mr. Fischman remains "impressed by his high standard of integrity," but also confused about Mr. Rukstales' involvement on January 6, 2021. *Id*. "I have no doubt that Mr. Rukstales had a significant lapse in judgment." *Id*. Nevertheless, he is confident that Mr. Rukstales "learned a valuable lesson" and "would not violate the law in the future." *Id*. He looks forward to continuing to do business with Mr. Rukstales in the future. *Id*.

Robert Glenn, another friend of Mr. Rukstales for decades, is a semi-retired trial lawyer whose career spans over forty (40) years. *See* Exhibit H. Mr. Glenn came to know Mr. Rukstales through their church and joint mission and musical endeavors. *Id*. Mr. Glenn was "utterly shocked by the events of January 6, 2021, the charges against him and conviction stemming therefrom," and strongly believes that Mr. Rukstales' "participation was antithetical to everything I know about him." *Id*. Mr. Glenn speaks very highly of Mr. Rukstales as a "musician and composer," and regales about their time together in the "praise band" at their church. *Id*. Even though Mr. Rukstales was always busy with his company, "he would go out of his way to spend additional time with any member of the praise team who needed assistance." *Id*. He describes Mr. Rukstales as an "amicable fellow" who is "easy to meet and befriend" and has "an

infectious laugh and a ready smile." *Id*. Mr. Glenn is also very proud and fond of the mission work he and Mr. Rukstales have been a part of in South Africa. *Id*.

Mr. Glenn was "not surprised" when he saw Mr. Rukstales' apology the next day "acknowledging and regretting" his mistake. *Id*. The two friends recently spent some time together and Mr. Glenn is adamant that Mr. Rukstales is "remorseful, accepts full responsibility for his actions and wants to atone for his crimes." *Id*. Most notably, Mr. Glenn tells the Court that he considers himself "fortunate to know him," and this "anomaly" does not change his opinion of Mr. Rukstales' "character, integrity, or peaceful nature." *Id*.

Brian Rukstales is Mr. Rukstales' older brother, and he states that "[t]hroughout his entire life Brad has been a person whose honesty, humility, character, and integrity I have never had cause to question." *See* Exhibit I. From an early age, Brian describes Mr. Rukstales as being the "model of a self-starting, motivated, committed worker and community member." *Id*. He is proud of his brother's dedication to his family, community, and business, and gives the Court examples of Mr. Rukstales' kind-hearted nature. *Id*.

Speaking directly to the events of January 6, Brian had a discussion with his brother on January 7, where Mr. Rukstales said "Brian, I just made the biggest mistake of my life…" *Id*. It is evident that Brian loves his younger brother, but Brian makes it equally clear that he "would not be writing this letter" if he did not believe Mr. Rukstales was sincerely remorseful for his actions. *Id*. He is confident that Mr. Rukstales is "a good person" who made "a bad decision and behaved in a way that is inconsistent with his character." *Id*.

Pastor Micah Greiner has known Mr. Rukstales for fourteen (14) years as a "long-time friend," and "as a member, volunteer, and leader in the congregation." *See* Exhibit J. Pastor Micah "was completely surprised" after learning of Mr. Rukstales' presence in the Capitol on

January 6, 2021, and reached out to Mr. Rukstales to "provide him spiritual counsel." *Id*. Although the pastor says that Mr. Rukstales' "lapse in judgment was undeniable, and his actions inexcusable," he "was encouraged to learn that he was truly repentant for his poor decisions." *Id*.

Pastor Micah knows Mr. Rukstales very well, and his opinion does not come lightly. He has "witnessed Brad demonstrate kindness, compassion, courage, and generosity" throughout the years, and is especially thankful to Mr. Rukstales as being "instrumental in helping me succeed" when he was selected as Lead Pastor of their church. *Id*. Pastor Micah is convinced that this experience "will reinvigorate his desire to uplift the community and use his unparalleled creativity and drive to do good wherever he can." *Id*.

A friend since high school, Chris Mosher writes that Mr. Rukstales was always a "man of high values and morals in every situation that I saw him in." *See* Exhibit K. Mr. Mosher shares a story with the Court that demonstrates Mr. Rukstales' helpful and loving nature. *Id*. After graduating high school, Mr. Mosher went through some very difficult times in his life – his parents divorced and moved to different areas. *Id*. Mr. Mosher eventually became homeless, and "Brad was the one that jumped in and made sure that I had a place to stay until I got on my feet." *Id*. Like others, "it was a big surprise" when he "read about Brad's involvement in the events of Jan. 6." *Id*. "While I've always known Brad to be a man that would stand up for what he believes in, he has never been a law breaker." *Id*. Mr. Mosher makes it a point to note that he and Mr. Rukstales differ politically on many issues, but that "he has always spoken to me with love and has always listened to my viewpoint without the need to shame me or belittle me in any way." *Id*. Regardless of their differences, he believes Mr. Rukstales "is a very good man that made a very poor choice," and he "would bet everything" that "he [Mr. Rukstales] will never do anything like it again." *Id*.

It is clear that Mr. Rukstales is a man of great values who recognizes that he made the worst decision of his life by entering the Capitol on January 6, 2021.

### C.  Mr. Rukstales' Poses Little or No Risk of Recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Rukstales does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's findings that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Rukstales' character, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically, with respect to Mr. Rukstales, who is 53 years old, defendants over the age of 50 with no criminal history have a recidivism rate of only 6.2 %. *Id.* at 28. There is, quite simply, nothing in the record to indicate that Mr. Rukstales would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Rukstales are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are

13

ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*).

Beyond the statistics, Mr. Rukstales personally presents no risk of recidivism. As detailed by his family and friends, Mr. Rukstales has lived his entire life guided by principles completely incongruous with his actions on January 6, 2021. As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Rukstales himself. He immediately took ownership of his actions and publicly acknowledged his wrongdoing because he sincerely regretted what he had done.

During the ensuing ten months, through therapy and personal reflection, Mr. Rukstales has confronted head-on what led him to be present in the Capitol on January 6 and taken concrete steps to ensure he will never put himself in such a situation again.

Moreover, regardless of the sentence imposed by this Court, Mr. Rukstales has already faced devastating consequences as a result of his actions and arrest. His professional and personal life are forever changed, and his actions on January 6 will remain a dramatic aberration in an otherwise exemplary life of service to his family and community. As such, the requested sentence of probation is appropriate to serve as an adequate deterrent to Mr. Rukstales and protection for the public.

### D. The Need to Avoid Unwarranted Sentence Disparities In Similarly Situated Defendants.

The Court must consider the need to avoid unwarranted sentence disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* 18 U.S.C § 3553(a)(6); *see also United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008). It is especially important to consider this factor when it comes to the January 6 Capitol breach cases because of the vast array of conduct and character differences. Unlike many other January

6 defendants, Mr. Rukstales made no incendiary comments online or social media posts in the days before January 6. Nor did he proudly promote his participation in the riot afterwards as did so many other defendants. In fact, Mr. Rukstales did the opposite, publicly apologizing and unequivocally condemning his actions at the Capitol. Unlike so many of the other defendants who have made similar statements after pleading guilty or when asking for leniency from the Court, Mr. Rukstales made his statement on January 7, 2021, immediately upon returning home to Illinois.

Unlike many other January 6 defendants, Mr. Rukstales was not violent or aggressive in word or deed. He didn't force his way into the Capitol building or climb through a broken window. He didn't barge past officers or travel through clouds of tear gas. Instead, along with hundreds of others, he walked through an open door.

These distinctions are important not to minimize Mr. Rukstales' culpability, but to contrast his actions with more egregious behavior of many other defendants and properly place his conduct on the spectrum of January 6 defendants.

As an example, in *United States v. Bennett*, the Government sought a three-month period of home confinement after a guilty plea to parading. *See* 1:21-cr-227-JEB. Mr. Bennett was an admirer of the Proud Boys, was very active on social media planning and promoting the events of January 6, 2021, and livestreamed while inside the Capitol for nearly 30 minutes, documenting much of the riotous behavior. *Id*. at ECF No. 24. The Government made clear that there was no evidence that Mr. Bennett committed any violence or destruction while inside. Ultimately, Judge Boasberg sentenced Mr. Bennett to twenty-four (24) months of probation, along with the $500 restitution and $10 special assessment.

15

Another example that provides guidance to the Court is *United States v. Bustle*, who pled guilty to parading, and was sentenced to twenty-four (24) months of probation after being inside the Capitol for 30 minutes and posting "we need a revolution" on social media. She was also not accused of any violence or destruction. *See* 1:21-cr-238 at ECF No. 39.

In *United States v. Rosa*, the Government sought a sentence of one (1) month of home confinement after a plea to parading. *See* 1:21-cr-68-TNM, ECF No. 66. Mr. Rosa posted on social media about the day's events and acknowledged hearing bangs and smelling pepper spray in the air – an admission that the situation was escalating. He remained inside the Capitol for approximately 20 minutes, but there was no evidence he participated in any violence or destruction. *Id*. Ultimately, Judge McFadden sentenced Mr. Rosa to twelve (12) months of probation, along with the $500 restitution and $10 special assessment. *Id*. at 79. In *United States v. Doyle*, Judge McFadden sentenced the defendant to two (2) months of probation and a $3,000 fine, $500 in restitution, and a $10 special assessment after she entered the Capitol through a broken window, remained inside for 24 minutes, and appeared to be chanting and yelling in the direction of law enforcement. 1:21-cr-324-TNM at ECF No. 27, 34.

This Court has already sentenced two co-defendants of Mr. Rukstales – Michael Curzio and Thomas Gallagher. *See* 1:21-cr-41-CJN. Mr. Curzio was held pretrial and ultimately sentenced to six (6) months of incarceration, which amounted to time served. This was due to Mr. Curzio's extensive criminal history, which most notably included a conviction for attempted first degree murder. *Id*. at ECF No. 54. Mr. Curzio's matter is clearly distinguishable from Mr. Rukstales, particularly as it pertains to individual character.

In terms of conduct, however, Mr. Gallagher's case is very similar, and he was sentenced to twenty-four (24) months of probation and 60 hours of community service, $500 restitution,

16

and a $10 special assessment. *Id*. The Court rejected the Government's request for a one-month period of home confinement. *Id*. at ECF No. 105 (docket entry dated 10/13/2021).

There have been individuals who have received sentences including incarceration, but their conduct is easily distinguishable and much more serious than Mr. Rukstales. In *United States v. Rau*, the defendant entered a guilty plea to one (1) count of Disorderly Conduct in a Capitol Building. He received a 45-day jail sentence, $500 in restitution, and a $10 special assessment, primarily because he came to Washington, D.C. prepared for violence by bringing Kevlar-lined gloves and a medical kit, entered the Speaker's conference room inside the Capitol, encouraged and incited violence against police, and deleted evidence from his cell phone after the fact. 1:21-cr-467 at ECF No. 13.

Mr. Rau's codefendant, Derek Jancart, was given the same sentence following a guilty plea to the same charge for many of the same reasons – coming to Washington, D.C. prepared for violence by bringing a gas mask and two-way radios, encouraging and inciting violence during the riot, and his substantial social media activity spreading propaganda and downplaying the seriousness of January 6, 2021. *See United States v. Jancart*, 1:21-cr-148, ECF No. 25.

Mr. Rukstales' character and conduct are easily distinguishable. Mr. Rukstales walked into the Capitol through an open door, not a broken window like in *Doyle*, and made his way to the Visitor Center down the stairs. Chairs were being thrown down the stairs by others, and as Mr. Rukstales reached the bottom of the stairs, he picked up a chair that was in front of him and tossed it to the side as he walked forward. No officers were nearby or at risk of being struck by the chair and there is no evidence the chair was even damaged. ███████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ The arrest

17

occurred when a melee ensued in front of Mr. Rukstales, and an officer brushed past Mr. Rukstales, and Mr. Rukstales reached his arm out in the officer's direction. Notwithstanding this, there is no evidence Mr. Rukstales was violent, and he complied with law enforcement upon arrest.

### E. Mr. Rukstales' Public Demise Serves as Adequate Deterrence to Others.

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." There is no need for personal deterrence in this case, as Mr. Rukstales is not the type of person who would commit any further crimes in the future. Mr. Rukstales has absolutely no criminal history, and this experience has been a defining moment in his life. Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Rukstales' offense simply by charging and convicting him. As a result, numerous media outlets will discuss Mr. Rukstales' and the substance of his offense, as they have done throughout the pendency of this matter. Further, Mr. Rukstales will be discussed in various conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which he simply cannot escape. In short, Mr. Rukstales' public and professional demise sends a strong message to anyone who might attempt such conduct in the future.

Respectfully submitted,

_____/s/_____
David Benowitz
Bar # 451557
*Counsel for Bradley Rukstales*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November 2021, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF to Assistant United States Attorneys Seth Meinero and Susan Lehr, United States Attorney's Office, 555 4th Street, NW, Rm. 4840, Washington, D.C. 20530.

_____/s/_____
David Benowitz