IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:21-cr-41-CJN-5 |
| BRADLEY RUSKTALES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO GOVERNMENT'S
<u>SENTENCING MEMORANDUM</u>

**I.   INTRODUCTION**

Bradley Rukstales, by and through undersigned counsel, respectfully submits this Reply to the government's Sentencing Memorandum ("Govt' Memo.") in support of his request for a probationary sentence. This request is supported by the United States Probation Office, which recommends that the Court place Mr. Rukstales on eighteen (18) months of probation with specific conditions. *See* Sentencing Recommendation, ECF 127.

*The Nature And Circumstances of the Offense*

The government correctly states in its Sentencing Memorandum that each defendant should be judged based on their individual conduct. Recognizing the wide variety of defendants charged with crimes connected to January 6, 2021, and the disparate levels of planning, violence, incitement, and subsequent showing of remorse amongst them, it is entirely appropriate for this Court to assess them, as the government writes, "on a spectrum." *See* Govt' Memo. at 17.

However, when laying out nine (9) factors for the Court's consideration in placing defendants on such a spectrum, the government only addresses a small number of these factors it claims weigh against Mr. Rukstales as support for its contention that he should be incarcerated. In doing so, the government drastically overstates the justifications for its sentencing

recommendation, and fails to account for the significance of Mr. Rukstales' consistent and immediate contrition, lack of prior planning, and numerous other factors warranting a non-carceral sentence.

### A. Mr. Rukstales Witnessed No Violence or Destruction of Property When He Entered the Capitol Building Through an Open Door.

Mr. Rukstales came to Washington, DC, on January 6, 2021, prompted by the then-President of the United States and several of his high-profile supporters in the government, to attend a political rally.  He had no advance knowledge that anyone would be entering the Capitol building and had no intention of doing so himself.  Mr. Rukstales' lack of advance planning stands in stark contrast to other January 6 defendants such as Douglas Sweet, who, in an interview with a local news station on January 7, explicitly acknowledged that he came to D.C. hoping to "talk to the Senate and the House" and that he might have to "pretty much force [his] way in."  *United States v. Sweet*, 21-cr-41, ECF No. 115 at 8.  On January 6, defendant Jenna Ryan posted a video on her Facebook page saying: "We're gonna go down and storm the Capitol."[1]

Regrettably, Mr. Rukstales ultimately entered the Capitol building.  However, at the time of his entry, he was not aware that others had gained entry by destroying property or by forcing their way past Capitol Police. That is not to say he was under any impression at the time that his entry was proper or lawful.  However, the circumstances of his entry are distinguishable from Mr. Sweet, who entered the building immediately after seeing and photographing a rioter breaking into a Capitol window.  *Id.* at 3-4.  Defendant Danielle Doyle entered the Capitol building through a broken window.  *See United States v. Doyle*, 21-cr-324, ECF No. 27 at 3-4.

---

[1] https://www.newsweek.com/jenna-ryan-capitol-riot-60-days-prison-pop-champagne-1646279

2

As she entered the Capitol, defendant Cindy Fitchett recorded a video of herself, stating in a raised voice, "We are storming the Capitol.  We have broken in.  Patriots arise." *See* Statement of Offense, 21-cr-41-CJN-1, ECF 82 at 3.

Other defendants arrived in Washington, D.C. on January 6 fully prepared for violence and destruction.  Derek Jancart, for example, posted a photo on social media of a pickaxe, asking, "Anyone know the laws on pickaxes in D.C.?"  *See United States v. Derek Jancart*, 21-cr-148, ECF 25 at 3.  His companion, Erik Rau, came to Washington, D.C. with Kevlar-lined gloves.  *Id*.

Mr. Rukstales' entry shows a far lower level of culpability or awareness of violence and destruction committed by others.  He followed others through a door without having seen others engaged in violence or destructive entry.

### B. Mr. Rukstales Engaged in No Violence Against Police Officers.

Once inside the building, Mr. Rukstales did not commit any acts of violence against police officers or destroy any property.  The government discusses at great length Mr. Rukstales' throwing of a chair in the Capitol Visitor's Center well after police officers had moved out of the immediate area, an act which posed no danger to others, damaged no property and was an isolated, unplanned and impulsive choice.  Mr. Rukstales threw the chair approximately thirty (30) seconds after officers had moved from the area around the bottom of the escalators in the Capitol Visitor's Center ("CVC") to the end of a corridor in the CVC.  At the time Mr. Rukstales threw the chair, which had been previously upended by someone else, there were no officers close enough to even be in his immediate line of sight, and the chair was not directed at anyone.

   1. *Mr. Rukstales did not intentionally resist police officers.*

The government further uses Mr. Rukstales' difficulty standing up after being struck to the ground by a police officer as justification for its sentencing recommendation. This argument is not viable. After being struck by a Capitol Police Officer with enough force to take him off of his feet, Mr. Rukstales, who was 52 years old at the time, became temporarily overcome with shock by the chaotic events rapidly unfolding around him. A non-police officer[2] and an officer grabbed Mr. Rukstales. He heard an officer tell him to stay down on the ground. It appears that an officer then attempted to pull Mr. Rukstales by one arm, perhaps to his feet, seconds after he'd been knocked to the ground. He remained on the ground for a matter of seconds before being dragged away by two officers and was subsequently entirely cooperative with the police. Mr. Rukstales fully acknowledges and regrets his role in the chaos. Still, his inability to quickly get to his feet after being taken to the ground by the police with great force was absolutely not intentional resistance.

   **C. Mr. Rukstales Destroyed No Property In the Building.**

Mr. Rukstales acknowledges and unequivocally regrets throwing a chair while in the CVC. This single action is contrary to his character. It was also a completely isolated incident within the context of his actions inside the Capitol. He did not assault police officers or destroy any property. Aside from this single disorderly act, Mr. Rukstales spent the entirety of his time inside the building wandering the halls with no specific plan.

---

[2] Presumably someone who had illegally entered the Capitol.

**D. Mr. Rukstales Condemned Violence and His Own Actions Almost Immediately After His Arrest.**

In his statement posted to Twitter on January 7, Mr. Rukstales strongly condemned not only the violence and destruction committed by others the previous day but also his part in contributing to the chaos. His statement to a local news channel re-affirming his regret for participating in the riot was made before he had obtained legal counsel.[4]

Other defendants, however, attempted to justify their actions. On January 7, when asked about why he participated during an interview by a local news station, defendant Sweet said, "Well, what other recourse do we have exactly?" *Sweet*, ECF 25 at 8. Statements rationalizing the actions of January 6 serve as an encouragement to others to repeat those actions. On March 26, 2021, defendant Jenna Ryan tweeted "Definitely not going to jail…I did nothing wrong." Statements such as the one given by Mr. Rukstales do the exact opposite.

**E. Mr. Rukstales Did Not Destroy Evidence During or After January 6.**

Mr. Rukstales' continued co-operation after the events of January 6 and his lack of attempts to circumvent law enforcement through attempting the destruction of evidence stands in stark contrast to other defendants. Following January 6, other defendants attempted to remove evidence and footage from their phones. For example, Erik Rau deleted evidence from his cell phone of his participation in penetrating the Capitol all the way to the Speaker's conference

---

[3] During that interview, Rukstales said: "[I]t was great to see a whole bunch of people together in the morning [of January 6] and hear the speeches, but . . . it turned into . . . chaos. . . . I had nothing to do with charging anybody or anything or . . . any of that . . . I was in the wrong place at the wrong time, and I regret my part in that . . . Everything that happened yesterday, I think, was absolutely terrible . . . I'm sorry for my part in it . . . I think the violence was terrible." Govt' Memo. at 14.

[4] Mr. Rukstales subsequently obtained counsel and drove from Illinois to Washington, DC to turn himself in to law enforcement on January 11, 2021.

room. *See United States v. Rau*, 21-cr-467, ECF Document 13 at 3. Mr. Rukstales did nothing of the sort.

### F. Mr. Rukstales Was in the Capitol for Less Than Thirty Minutes, Entered No Private Offices, and Did Not Enter the House or Senate Chambers.

Mr. Rukstales continues to express regret for his presence in the Capitol during the events of January 6. While his presence is inexcusable, the duration of his presence is important to note. Mr. Rukstales did not force his way into the Capitol building or climb through a broken window. Unlike other defendants, he didn't barge past officers or travel through clouds of tear gas. Instead, along with hundreds of others, he walked in through an open door. Defendants Jancart and Rau, for instance, "walked past the shattered glass and penetrated further into the U.S. Capitol until they arrived at Speaker Pelosi's conference room where Rau overheard another rioter shouting to 'shit on her desk.'" *See Rau*, 21-cr-467, ECF 13 at 2. Mr. Rukstales entered none of these areas.

### G. Mr. Rukstales Did Not Post Inflammatory or Inciting Social Media Comments Regarding Entry Into the Capitol Before, During, or After the Incursion.

The government is understandably concerned about the degree to which social media contributed to the violence of January 6. Videos such as the one recorded by defendant Cindy Fitchett, in which she proclaims, "We are storming the Capitol; we have broken in; patriots arise; woo!" (*See Fitchett*, 21-cr-41, ECF 82 at 3) directly contributed to the chaos and encouraged rioters to enter the Capitol building. Defendant Erik Rau recorded video of rioters breaking through a police line and said, "We made it up to the Capitol…. We have the police surrounded!" *See Rau*, 21-cr-467, ECF 13 at 3. He recorded encouragement of other rioters pushing past guards, which was posted to Facebook by his companion Derek Jancart. *Id* at 4.

6

Jenna Ryan tried to promote her real estate business *during* the riot.  *See Ryan*, 1:21-cr-50-CRC-1, ECF 48 at 4.  Mr. Rukstales posted no such material to social media.

### H. Mr. Rukstales Has agreed to Grant Access to His Social Media Accounts to Law Enforcement.

Unlike many other defendants, Mr. Rukstales was arrested in the Capitol building and was not asked by law enforcement officers at the time for access to his phone or social media. Nor was a request for access subsequently made through counsel.  Mr. Rukstales has agreed to provide access as part of his plea agreement.

### I. Mr. Rukstales Consistently and Unequivocally Showed Remorse For His Actions Immediately After January 6.

Mr. Rukstales was one of the earliest, if not the first, January 6 defendant to express remorse for his participation in the riot.  As discussed *supra* he did not attempt to rationalize or justify his conduct.  While he did not specifically mention his throwing of a chair, this omission in no way detracts from his publicly expressed remorse, especially when compared to other defendants who espoused views of privilege as support for their belief of immunity from punishment. Defendants like Jenna Ryan made post-arrest public statements reflecting a belief that she was immune from punishment because of her social status and a personal message that she would get off "Scott free."  *See Ryan*, 21-cr-050-CRC-1, ECF 48 at 5. The Court sentencing Ms. Ryan understandably concluded that for her, incarceration was a necessary deterrent, unlike Mr. Rukstales, who has consistently and publicly expressed remorse for his participation.

Respectfully submitted,

_____/s/_____
David Benowitz
DC Bar # 451557
*Counsel for Bradley Rukstales*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of November 2021, I caused a true and correct copy of the foregoing Defendant's Reply to Government's Sentencing Memorandum to be delivered via ECF to Assistant United States Attorneys Seth Meinero and Susan Lehr, United States Attorney's Office, 555 4th Street, NW, Rm. 4840, Washington, D.C. 20530.

_____/s/_____
David Benowitz